Case No. 21-7078, State of New York et al. imbalance v. Meta Platforms, Inc. Ms. Underwood for the imbalance, Mr. Barr, unequus curiae for the United States, Mr. Banner for the embolism. Ms. Underwood, good morning. May it please the Court, Barbara Underwood for the State. Forty-six states and D.C. and Guam have alleged that Facebook, now Meta, has used its monopoly power to buy or bury potential competitors, and in CEO Mark Zuckerberg's words, to build a competitive moat around itself in violation of the antitrust laws. It did this through a course of conduct that involved acquiring some potential competitors and also requiring any app that wanted to use the Facebook platform to avoid conduct Facebook deemed potentially competitive. As a result, it has stifled competition and denied consumers the improvements in service and other benefits that competition provides. The states bring this action to protect the public from the continuing harm caused by this conduct. In dismissing the complaint without discovery, the Court below made three basic errors. It applied latches to bar the acquisition-based claims of the sovereign states, despite the longstanding principle of equity, that a sovereign suing to protect public rights is not subject to latches. It wrongly concluded that many of the restrictions Facebook placed on apps were lawful and that any unlawful acts were somehow beyond the scope of injunctive relief, and it ignored the fact that the states allege a course of conduct in which each act reinforces the competitive effects of the others. I'd like to start by explaining why latches doesn't bar the states' acquisition-based challenges and then explain why the other exclusionary conduct states an antitrust claim that warrants injunctive relief, whether considered alone or as part of a course of conduct. So the doctrine of latches does not apply to this action brought by the sovereign states, and even if it did, it wouldn't justify this dismissal. Do you agree that the states are proceeding as what the Supreme Court has described as quasi-sovereign capacity, not a fully sovereign capacity? No, what I would say is that the harm that they're seeking to redress isn't quasi-sovereign harm. The state, in a parent's action, doesn't sue solely for the injuries to individuals, but rather for harm to individuals when that harm also harms the state. But the lawsuit is a fully sovereign act. Only the sovereign can do it. And so the equitable doctrine of latches shouldn't cut off the ability of the sovereign states to perform their fundamental duty to protect their residents. But the Supreme Court described this parent's patriotic posture as quasi-sovereign, even though it acknowledged that there were sovereign interests involved. And then the Supreme Court has further distinguished that from state acting as a sovereign enforcing its own law. Well, it's different from a state enforcing its own laws, yes. But the state has to act as a sovereign to bring this action. It is redressing a quasi-sovereign injury. It does not stand exactly and identically in the same position as the United States. But it is performing a crucial, sovereign law enforcement function that is different from a private action, complementing the federal government's role. And like the U.S., when performing that function, it should not be subject to latches. If we were to agree with you that the district court misapplied latches at the motion-to-dismiss stage, we wouldn't have to reach the first issue. I'm sorry, didn't hear the end of that. If we agreed with you that the district court misapplied latches at the motion-to-dismiss stage, then we wouldn't have to resolve that first question as to whether or not latches applies to states, because even if it did, the district court erred. If we were to follow that argument. If I understand your question, it's even if latches could, in principle, apply to the states, it provides no basis to dismiss this complaint as a matter of law on this motion-to-dismiss, and therefore you don't have to reach the more general question if you were to choose to do that. And I could talk about that, if that would be helpful. Latches requires, assuming latches is capable of being applied to the states here, it would require both unreasonable delay by the plaintiffs and prejudice or harm to the defendants from the delay. And neither one is present here. I'd like to start with prejudice because I think it's the easiest. There was no harm to Facebook from the states filing their complaint in 2020 instead of a few years earlier. And that's what's at issue here. Prejudice not from the fact of the complaint, but from its timing. And that ruling was wrong for at least three reasons. One, the trial court invoked a presumption of prejudice from the simple lapse of time, but this court requires evidence, not presumptions. So, as Your Honor said, it's not really appropriate to resolve that at the motion-to-dismiss stage. Also, the court relied on allegations in the complaint that Facebook stated an intent to integrate these acquired companies, relied on that as a basis for finding prejudice, but the court ignored the contrary allegations that Facebook terminated or never started implementing that plan. These are questions of fact. The complaint doesn't, on its face, support the finding of prejudice. Again, we take evidence beyond the complaint to determine the fact. And finally, Facebook is facing a parallel suit brought by the Federal Trade Commission and not barred by laches, challenging the same acquisitions and seeking effectively the same relief. That complaint was filed at the same time in 2020 as the state's complaint. As a result of the FTC suit, the acquisitions here are not in repose. The same remedies are available. And Facebook can point to no incremental harm from the timing of the state's filing in 2020. Well, the district court always has discretion whether to issue a permanent injunction or not. And many of the factors that go into the exercise of that discretion overlap with the question of laches. You would agree that simply because there's been a violation doesn't automatically lead to the propriety of issuing a permanent injunction. You would agree with that, would you not? I would agree with that. But we're at the motion to dismiss stage where the facts that would be needed either. Well, even at the motion to dismiss stage, the district court could evaluate the situation and say, for example, as Judge Boasberg did with respect to platform claims, there's nothing I can do at this stage to undo the harm by issuing an injunction. And therefore, I dismiss those claims. Well, that was his reasoning, was it not? That was his reasoning, not as to laches, as to the platform. Exactly. Well, that's my point. My point is that simply because the FTC has brought an action doesn't mean that the FTC, even if it prevailed on the merits, would be entitled to injunctive relief. No, and it doesn't mean we would either. But what I'm saying is there is no incremental prejudice, this is on the laches question, from our bringing our claim at the same time, which laches would say is too late. There's no prejudice from that. The issues you've described would be in the case. And I'd like to address them. But for now, the point is that there is no additional harm from the bringing of this case, the state's case, at the same time that the FTC case was brought. I'd like to point out on these claims of prejudice that they're based entirely on the prospect of divestiture as a remedy or unscrambling the egg. And that is not the only possible remedy. There are other remedies that could address the harm inflicted on consumers by the anti-competitive acquisitions here. For example, they would be prospective remedies. They would be, for instance, requiring Facebook to segregate the data from the acquired companies going forward without unscrambling any already scrambled egg. It could be, as we requested in our complaint, there could be a guard against future large anti-competitive acquisitions by requiring notice to the states before such acquisitions can proceed. And Facebook could be required to take actions that promote user choice in the future, promoting competition in place of the competition that was wrongly suppressed by these acquisitions, such as requiring Facebook to allow data portability or interoperability, techniques that enable consumers to switch to rivals if they should choose. So it's simply not the case that the only available remedy is divestiture and that it's not the case that prejudice should be analyzed entirely with reference to that. So there is no prejudice to Facebook. There would be no prejudice to Facebook from applying these remedies now rather than a few years ago, or at least I haven't alleged any at all. It's also the case that the delay was not unreasonable. The complete lack of prejudice would be enough to defeat the Latches defense, but it also fails because the timing of the complaint was reasonable. The district court said that in considering whether Latches bars a claim for injunctive relief, the starting presumption is the same four-year limitations period that applies to a suit for damages. But that is inconsistent with this court's precedence. This court has repeatedly said that the equitable defense of Latches depends on the equity, the reasons for delay, and the resulting prejudice, not the limitations period for damaged suits. Here again, then, whether the timing was reasonable, like prejudice, is a factual question. The complaint doesn't provide any basis finding unreasonable delay, and the district court therefore shouldn't have dismissed on that ground. An inquiry into the relevant facts would show that the states acted reasonably and responsibly in investigating Facebook's conduct and evaluating its significance before filing this complaint. When Facebook first acquired Instagram and WhatsApp, what we now call the market for personal social network services was still developing and not well understood. The anti-competitive character of these acquisitions was not immediately apparent. Smartphones were just beginning to be widely adopted. The importance of phone camera photos wasn't immediately clear, nor the relationship of phone messaging and social networks. FTC apparently did not perceive the anti-competitive character in its pre-acquisition review. It's also the case that Facebook made misrepresentations at the time of the acquisitions, which tended to conciliate a competitive nature of these acquisitions. Facebook disavowed any plan to use WhatsApp user data to promote Facebook, but later they did just that. And finally, it's a matter of public record that in December 2018, strong evidence of the buy or bury strategy emerged. When a British Parliament committee leaked sealed documents it got from a California lawsuit, these documents did not emerge from an antitrust investigation. The California suit was a contract suit and the British investigation was about privacy,  which ultimately resulted in strong evidence of a scheme. It looks like I'm running out of time here. I think what I'd like to do since the DOJ council is going to be arguing the merits of the analytical approach to this material, I think maybe I will skip that for a moment because I want to say also to address Judge Randolph's point, that there is no basis for the district court's ruling that there can be no injunctive relief, even if there was a violation of law here. That is what the judge found on the ground that the conduct happened too long ago and that there is no longer anything to prevent or repair. There's no basis to find on the pleadings that Facebook's anti-competitive conduct will not recur. In fact, there are plenty of reasons to think it will with the number of incidents and recent press coverage of similar conduct. The allegations here can't be rejected on the pleadings. And also, the complaint alleges that Facebook has disciplined the marketplace not to take actions threatening its monopoly, that led to the varying responses in the complaint. The app developers now know that competing with Facebook will incur the wrath of Mark, and so they don't do it. Injunctive relief is needed to assure that they will not be distorted by the wrath of Mark. If I understand correctly, I only have a little bit of time left for rebuttal, and I'd like to give you five minutes. Thank you. Mr. Haar. Morning. Good morning. May it please the court. Daniel Haar for the United States. This is a vitally important anti-trust case. In recent decades, a handful of digital platforms have become increasingly dominant. Section 2 of the Sherman Act was designed to be flexible and vigorous enough to confront evolving threats to a competitive economy. The relevant inquiry must be fact-specific, as this supports Microsoft's decision recognized. Here, however, the district court departed unjustifiably from the flexible approach of Microsoft. Confirming that error could hobble Section 2's ability to protect competition, especially in the digital economy. The states made two related sets of allegations about Facebook's platform conduct, one regarding anti-competitive conditions that Facebook imposed on apps operating on its platform, and a second regarding apps that were denied access. The district court committed legal error with respect to both. First, it failed to apply Microsoft to the anti-competitive conditions, treating them as refusals to deal. And second, when it analyzed refusals, it announced an erroneous standard. As to the first error, the district court wrongly concluded the anti-competitive conditions Facebook imposed on app developers were no more than unilateral refusals to deal. Microsoft sets forth the default standard for finding conduct as anti-competitive under Section 2. It applies a fact-specific analysis to determine whether conduct harmed the competitive process, and to discuss later in the opinion whether it is reasonably capable, contributing significantly to the defendant's continued monopoly. There's no allegation, is there, that Facebook, as a condition of allowing an app access to its platform, required that the app not do business with a competitor? It did impose conditions that required the app to stand down from certain competitive apps. I just want an answer to that question. The question I asked is whether any condition that Facebook imposed required an app in order to get access to Facebook's platform not to put the same app on a competitor's platform. There's nothing I see. If you can point to an allegation to that effect, I'd like to see it. It didn't require that, but it did require that it not link in certain ways. So that takes it out of the realm of the Lorraine Journal, right? Because Lorraine Journal, that's what Lorraine Journal required. If you want to advertise with us, you can't advertise with a radio station. So that's how the district court distinguished Lorraine Journal, but it fails to distinguish Microsoft. The conditions that the Microsoft court analyzed under its default framework operated just the same way as the conditions challenged here. These are the conditions in the first wave agreements that Microsoft had with app developers, software developers. They discussed it in pages 71 through 72 and 75 through 76. That's at 253 at third in the Microsoft decision. Those conditions hold software developers for software sold to run to Windows users. That is sold to run on the Windows environment that they had to use certain features, Microsoft's Internet Explorer and Microsoft's version of Java. And the court, buying this default framework, found those conditions anti-competitive because they disabled cross-platform functionality. The conditions didn't speak at all to the types of apps those software developers could develop to run on non-Windows platforms. This is at page 75 of that decision. These conditions were limited to apps sold to Windows users. And the threat that Facebook targeted here was the same as the threat that the court analyzed in Microsoft. It was the cross-platform functionality. These were anti-competitive in Microsoft because the specific conditions disabled cross-platform functionality. And that's exactly what the state's complaint say was targeted by Facebook's conditions at the bottom of paragraph 199 of the complaint, that they were aimed at preventing app developers from bridging the gap with their apps' rival networks. These aren't refusals to deal. Facebook is dealing, and this is alleged at paragraph 194, with 10 million apps and websites. It's the anti-competitive effect of these restrictions on parties and ongoing deals with Facebook that gives rise to the anti-competitive harm, not from a refusal to deal. There are refusals to deal alleged in the complaint, but that's not what I'm talking about when I'm referring to the conditions and to the harm they cause. These were not refusals to deal, and the Supreme Court's decision in Eastman-Kodak confirms that. In footnote 8 of that decision, Eastman-Kodak v. Image Technical Services, the Supreme Court rejected the contention of Kodak that its parts policy, where it sold to customers on the condition that they do not deal with Kodak's rivals, was a refusal to deal, a unilateral refusal to deal. The Supreme Court squarely rejected that proposition. So these aren't refusals to deal. And the policy discussions in Trinco confirm that we're dealing with a vastly different scenario here. Trinco talked about a concern where courts are forcing sharing. Here there are ongoing deals already. There's no occasion to force sharing because the deals are happening already. It's deals with conditions that are preventing those parties in deals from engaging in certain forms of rivalry. Again, I point to 199 and 201 of the complaint. The rivalry that's prevented is the prevention of linking to or integrating with rivals or replicating Facebook's core functionality. They're in deals, but they're prevented from that rivalry. Because they're in deals and there's no occasion for sharing, courts aren't put in the role of acting as central planners, and their remedies don't risk facilitating collusion. Again, those parties are already together in deals. It's restrictive conditions in deals that antitrust law needs to scrutinize exactly to prevent the sorts of collusive firms that can happen in deals. A contrary view would mean that any terms and conditions in deals are treated as refusals to deal. It can't be true that price-fixing terms, market allocation terms, exclusive dealing terms, tying terms are just swallowed up by refusal to deal case law merely because there's a general right out there for businesses to deal with whom they wish. Antitrust law has never treated restrictive conditions that way. And Microsoft didn't for the materially similar conditions at issue here. One argument made by your friends on the other side is that we can't and should not look at conditions which by themselves are lawful and say, combine three or four of them through what they would call alchemy and claim that combining all of these lawful conditions together converts it into unlawful restraint of trade, and that that's what you are attempting to do here. What's your response to that? It's not alchemy. Many courts recognize that the competitive effects of conduct might come into true light by considering it together in its context. Even this court did it when analyzing some of the conditions. When I analyzed the first wave agreements, it said, oh, the foreclosure in this particular channel might not be great, but it takes on greater significance with the background that we already found foreclosure in the two primary channels, that's the OEM and the Internet access provider channels. So Microsoft, even though it didn't ultimately reach the total course of conduct, putting everything together, analyzed the number of the different types of anti-competitive conduct in the context of several other acts. And that's, in effect, what course of conduct does. It's not alchemy. It's normal when you look at the sum total of the acts alleged, you ask the question whether it's anti-competitive on Microsoft. If I have time, I would like to address why the court was wrong in the refusal to deal analysis stated to apply. All right. Thank you. The district court stated that there were three necessary conditions for any refusal to deal. That's wrong. In particular, a higher course of dealing cannot be required as a necessary element in all cases. Central question under the law. That's the law of our circuit is that it is required. The covid case. So help. We can't. We can't as an individual panel disregard that. It is a statement from Trinco in that right. And applied it, repeated it, and applied it and said that a prior course of dealing is a necessary element for establishing liability for refusal to deal. That was clear as a bell. That was the exact same regulatory context in Trinco. Trinco said in that context, it was necessary to have one or two things, either a prior voluntary course of dealing or that dealing would have happened absent regulatory compulsion. Trinco, however, left open the possibility that in a very different context, a different analysis by Trinco discuss otter tail favorably. Distinguish the fact as involving a situation where a product was provided to some customers voluntarily commercially, but otter tail did not require, did not involve the cessation for prior course of healing. The Supreme court imposed liability on otter tail for refusing to deal with newly formed municipal power. Viability was premise and anti-competitive motivation necessary to find predatory conduct was premise on a discriminatory pattern. Otter tail refused to deal with new companies with whom it never had a deal because they posed a competitive threat of retail while it provided the same product that is wholesale power for transmission services in areas where it didn't have a retail presence. It didn't retail. So in a different actual scenario in a different regulatory setting, Trinco clearly left open the possibility that a different pattern where no prior course of dealing was involved, but give right liability because it involved that same industry, same regulatory setting. And Trinco also couldn't present the situation that arose in otter tail. I will note finally, but it's the otter tail precedent, not the Trinco president. That's the analogous one here. Facebook, as I said before, is dealing with 10 million apps and websites. It's opened up its platform broadly as a complaint alleges at 79 through 82 and 189 through 195. Much of the value of Facebook's network was built based on investments from third parties. Facebook opened it up to them, but in case in the type of discriminatory feeling that was present in otter tail and gave rise to liability, dealt broadly but cut them off when a competitive threat arose. We would ask that this court reverse the errors. All right. We'll give you a couple of minutes and reply. Mr. Pan. Thank you, Judge Henderson. Please support. I'd like to begin by emphasizing that all of the conduct that's been discussed this morning took place many, many years ago. With regard, for example, to the policy to which DOJ's counsel referred, those policies were put into place in 2011, and some of the policies were put in place in 2013. Of course, the transactions took place in 2012 and 2014, and all of this conduct was, of course, quite open and publicized at the time. For example, that's obviously true with regard to the transactions. It's also true with regard to the platform policies, which were published. Developers had them available, so they knew about them. And yet we see a suit that's filed at the end of 2020. The doctrine of latches exists to prevent that kind of unfair delay, and the district court was correct to find that the state's suit challenging the acquisitions was barred by that doctrine. Now, the district court, I think, was correct in observing that it is impossible to read the court's analysis in California of the American stores, the Supreme Court's analysis in that case, without concluding that the Supreme Court understood that states would be subject to the same sorts of limitations on equitable remedies as other persons suing under Section 16. The states sue as private parties. That's what they're referred to as in that decision. And, of course, Justice Kennedy expressly said that it was his understanding that the state would be subject to latches on remand, and no justice expressed any disagreement with that observation. And it makes perfect sense that the states would be subject to latches, because in a parent's patriae suit, the state is not pursuing a sovereign interest in law enforcement. It sues on behalf of its citizens to vindicate those private injuries. And it's more akin to a class action than it is to an enforcement suit by a sovereign. And there's no reason that the state should be immune from the equitable limits that would apply to state pursuits by those citizens when it's those interests that the state is seeking to vindicate. And, you know, I think the court was also correct in finding that if there was ever a case that was barred by the doctrine of latches, it is the challenge to the acquisitions that are at issue here. With regards to the counsel for the states correctly says that there are two elements to a latches showing. One is, you know, Section 4C of the Clayton Act allows a state attorney general to sue for trouble damages. And it explicitly recognizes that when the state does that, it's suing as parents patriae. Correct. It was that an original part of the Clayton Act or was that an amendment? It wasn't. It was an amendment. What happened was in Hawaii, in the Hawaii case that is cited in the brief, the Supreme Court held that the state attorneys general could not sue parents patriae for damages. And there was an amendment. I believe it was part of the same amendments that adopted the Hart-Scott-Rodino amendments. But I'm not not certain. But it was the same era that added that cause of action. And under the Sherman Act, Section 7 of the Sherman Act, the Supreme Court held in the case that was a Georgia versus Evans that the state is a person. Correct. That's exactly right. And in Georgia versus Evans, the holding was that the states could sue for injunctive relief as a person. And then that's elaborated on in the Pennsylvania Railroad case where the nature of the parents patriae standing is is further explained. So so you move from I mean, that's the premise of your entire latches argument, isn't it? That they're suing in the shoes of the citizens of the United States or the citizens of their state. And the citizens of the state would be subject to latches. So therefore, the state itself is. That's right, Your Honor. And I think it's also critical to recognize, as Your Honor has pointed out, that the state simply sue under that Section 16, which is the general cause of action available to any private party.  Again, that the language in California, the American source refers to private parties suing under Section 16. And of course, in that case, the party suing was the state. And I think it's notable that the United States has repeatedly advised the courts that when states sue in under Section 16 of the Clayton Act, they sue as private parties and are subject to limitations that would apply to private parties. And of course, the United States did not support the states with regard to their challenge to the district courts holding. Did you cite instances where the United States took that position in briefs? Yet we do in our in our in our brief, Your Honor, we refer to the Microsoft case. There was that this was briefed by the United States. It was also briefed by the United States as amicus curiae in the Deutsche Telekom case that was much more recent. And it's not a position of the antitrust division or the solicitor general. I don't recall who signed those briefs, Your Honor, but I assume. Well, I shouldn't speculate here. I mean, my understanding would be obviously in this case, any appellate position would have had to be cleared by the obsolescence. But getting to the application of latches, I think the court was quite right to say that if there was ever a case in which latches needs to apply, even against the states with recognition of the importance of recognizing their the interest that the states carry with them. It is this. Remember, we're talking about mergers. And not only is a merger highly publicized and available for enforcers to scrutinize before it's cleared in this case, but the process, it's inevitable that after a company acquires another and begins to run it as part of a unified business, that the investment and business decisions will depend on that unified character. And that's why courts have rejected as barred by latches challenges, mergers that were filed far more promptly than the six and eight year delay that's here. I think that the presumption that the court recognized from other circuits is a sound one. Certainly in the case of a merger. Were any of those cases resolved on a motion to dismiss? Yes, Your Honor. The Ginsburg case was resolved on a motion to dismiss. And some of the cases involved. That was a district court opinion? No, that's the Ninth Circuit, Your Honor. The case was affirmed on the basis that there was no remedy available because of the delay. What do we do with our case law? Discouraging making a finding of latches based on a complaint. I know you cite the Lions case, but the Lions case, I don't think, is very strong precedent. One page per curium. And you look at the district court opinions in that case. And there are lots of extenuating circumstances from the face of the complaint, not the least of which is that the plaintiff in that case had filed a prior lawsuit and didn't raise something that they then raised in the second lawsuit that was brought after the statutory statute limitations. Your Honor, I think the way that you distinguish those is exactly the way the district court did. He acknowledged this court's statements regarding the rare circumstances in which it would be appropriate to dispose of a latches defense on a motion to dismiss. And as he said, seldom does not mean never. And the circumstances here, with regard to unreasonable delay, the states did not contest below that they had unreasonably delayed. And the district court relied on that. If you look at the appendix at 282, he actually has a rather elaborate discussion of that point. And he says, had the states responded to the substantial timeliness arguments that Facebook put forward in its motion to dismiss, which rests entirely and properly on facts that are either pleaded or properly traditionally noticed, by raising or even hinting at a factual dispute as to when their claims first accrued were a reasonable justification for their long delays in filing. The outcome here might well be different. They did not do so. So the district court, that goes to unreasonable delay. They waived, they forfeited any argument that they did not unreasonably delay. And then with regard to prejudice, again, the context is important. We're talking about a merger. On unreasonable delay, I mean, isn't it in the complaint that one reason for the delay was that the public was misled about Facebook's intentions with respect to, I guess, especially WhatsApp? Your Honor, with respect, that argument has no substance whatsoever. There is no argument at all with regard to any misleading statement with regard to Instagram of any kind. And the supposedly misleading statement with regard to WhatsApp has nothing to do with whether the nature or anti-competitive nature, allegedly anti-competitive nature of that acquisition. And again, this is not a situation where there is any argument that the matter of Facebook somehow concealed facts that were then later discovered. Because remember, the action that they rely on, the enforcement action that was taken in Europe about regarding this data sharing took place, I believe it was in 2015. It was quite soon after the transaction. So there's simply no excuse for, there's no fact that they claim was concealed for that period of time. And again, the prejudice point, there are allegations in the complaint, paragraph 125 of the complaint, I believe most of the relevant factual allegations are in the sealed version, but that make very clear the nature of the investment. But also just think about the logic of the claim. It is that Facebook, after acquiring Instagram and WhatsApp, continued to run them and have them provide these functionalities to consumers so that other companies would not necessarily be able to as easily to take that, provide those functions. That can only be true if Facebook continues to invest in and run these companies and provide services to consumers that continue to attract those consumers. I find it extraordinary that the state would suggest that there's a lack of investment in two apps that now serve, in the case of Instagram, something like a billion users worldwide. In the case of WhatsApp, 2.5 billion users worldwide. So, and again, the allegation is that Instagram was a tiny company when acquired and WhatsApp had 400 million users. It does not make any sense for the states to suggest that there's been a lack of investment in these companies. I would like to speak about the platform related claims. And with regard to that, the district court quite rightly held that under settled Section 2 law, Facebook violated no duty by placing restrictions on developers use of the platform to take users and engagement away from Facebook. Franco's basic no duty to deal rule covers all of the state's allegations, including each of the seven instances that are described in the state's complaint. The court likewise properly held that no injunctive relief was available to address those discrete instances, both because no preventative or reparative injunctive relief was available, and because, as we've argued in our appeal brief, that those claims were barred by latches, which the district court has also noted is likely applicable. That's in the appendix at 251. With regard to the, the government has, I think, largely, or has, the Department of Justice has largely relied on the suggestion that the district court improperly analyzed the state's claim of conditional dealing. But I think, Judge Randolph, your question got right at the problem with the state's theory here, which is there is simply no allegation of interference with the third party apps dealing with other apps. Any effort to interfere with that independent conduct by those. Is there anything you know, I think of Lorraine and I wondered to myself, if if the case had been one in which the journal said to advertisers, listen, if you advertise with us, you can't run the same ad with the radio station has to be a different. And I wonder if the case would have come out the same in that situation and whether that is the type of situation that we have here to draw the analogy. I just like your comment on. Sure. I think it's. I think that the case very well could have come out the other way. But I think the best way to draw the analogy, Your Honor, would be to say, suppose the journal had said, we have this, we have a service and we will design an ad for you. But, you know, and that will will provide that service for free. If you buy ad space, that's something that we will provide for free. But we don't want you to use the ad that we designed in some other publication. I see your point. That would be that would be analogous to what's going on here. And that would be completely fine. And again, I think that the distinction with this court's Microsoft case is that this court was very clear in analyzing the restrictions. Which Mr. Carr referred regarding OEMs and software developers that they were talking about exclusive dealing, both with regard to the manner in which the OEMs had to install Internet Explorer and their and the refusal to allow them to alter the boot sequence, et cetera. And with regard to the independent software vendors, the court found, the district court held and this court affirmed the idea, the fact that those restrictions on those independent software developers functioned as exclusive dealing. They prevented the independent software developers from featuring other forms of the Java virtual machine. And through that conduct, they were able to block Sun and other competitors from distributing their competing product, their competing middleware product. So those cases are quite different from the circumstance that we that was alleged in this case. And I think if you simply look at Trinko and the way that case has been understood and interpreted, both by the Supreme Court itself in Linkline and by the Tenth Circuit in an opinion by then Judge Gorsuch in Novell, the background rule is quite clear that a defendant generally has no obligation to deal with its rivals. And the reasons for that go to the importance of encouraging investment in facilities that will benefit consumers. It's Justice Breyer, I think, in his concurrence in the Verizon case, talks about the fact that you don't get competition from people sharing the same thing. You get competition from people building rival rival facilities and competing independently. Who are Facebook's competition now? Right now, Facebook has tremendous competition, as in the papers all the time. TikTok is obviously all over the papers because it's grown tremendously. Facebook has for many years competed with YouTube for users, compete with Twitter, compete with Snap, compete with Pinterest. I could name many more. But the fact is that one sees a dynamic market in which there's been substantial entry, both recently and over time. And, you know, one. Again, as a matter of just reading the newspapers, it's clear that the newspapers are reporting and this is not in the record. And I don't want you to affirm or deny that Facebook is losing millions of individuals who are under the age of 30, that there's a mass exodus from Facebook these days. Your Honor, I would only comment that sometimes facts that are good for an antitrust defense are bad for the business. And obviously the reporting is what it is. And MEDA addresses those issues through its public statements and securities filings, et cetera. So I'm not going to say anything about that. But it is plainly right. And again, this was not the basis of the district court's opinion, so I don't want to spend too much too much time on it. But it is plainly right that Facebook operates in an extremely competitive environment in which the ability to switch from one app to another is simply a matter of pressing an icon on the phone interface. And, you know, again, we're talking about conduct that occurred years ago. And it was never something that any enforcer challenged at the time, despite the affirmative allegation by the states that Facebook had a monopoly as early as 2011. The district court quite rightly recognized that the state's claims were stale and failed to implicate any duty under the antitrust law. The district court acknowledged, though, that the complaint alleged unlawful conduct from 2013 to 2015, did it not? No, it didn't, Your Honor. What it said was it didn't need to reach the question. And that reminds me. So let me answer that. And I also want to get back to a question that Your Honor asked of Mr. Haar. What the court said was, I don't need to reach the question of whether there's been enough alleged here to satisfy the standards of TRNCO, because the states don't identify any injunctive relief that could be granted with regard to those seven individual instances. And so I'm not going to parse through those allegations. But if you look at what's fled there, there's no question that TRNCO bars those claims because none of them involves an allegation of a profitable prior course of dealing that was terminated under circumstances that would suggest a sacrifice. He also said that some of those of the seven that some of those companies are defunct. Most several of them are. Yes. Do you know how many and which ones? I don't have that information off the top of my head. I know that photo is defunct. I believe Circle is defunct. I believe. Boxer is not defunct, I believe. But they were the only seven companies mentioned in the complaint where Facebook had prior dealing. Is that true? Sorry, Your Honor. Those seven companies were the only ones mentioned in the complaint in which which Facebook had prior dealings with. Actually, of the seven, Facebook had prior dealings with six. There was no court. There was never a course of dealing established. Mine was a video that was owned by Twitter and Facebook never dealt with them. They also defunct, Your Honor, as my understanding. But those are the only examples. It's not that their counsel was correct. I think it's a fact that is strongly favorable to Facebook that millions of apps have dealt with. Facebook have taken advantage of the APIs that Facebook offers and the pro competitive platform. I understand that. But those seven were the only ones named. That's right. That's right, Your Honor. And as I say, six of them actually had a prior course of dealing. If I may, Judge Wilkins, just to get back to one point, you you referred to the point about referred to our argument referring to the link line case about the alchemy phrase. And a slightly different point about that, which I wanted to clarify. None of the the the point that Judge Boasberg was relying on there is there's been a reference to a course of conduct and a number of them. We stress that somehow he failed to adequately consider the allegation that there was a course of conduct. If you read the opinion, I don't understand how people can make that argument because he clearly addressed all of the arguments regarding this supposed course of conduct. But the point here was that there were allegations that there were refusals, the refusal to deal policy. Because none of the refusals to deal went into the limitations period. But the states argued, well, you had you had the policy in place at some later time. And so we can take the existence of the policy and use that to to bring the allegations about acquisitions forward because it's part of a course of conduct. Now, I'm not sure we stressed enough in our briefing that the policies were held to be lawful, correctly so. And so that really doesn't get the states anywhere. But the additional point to make is that there to the extent that those that there's a challenge to some individual application of a policy that that's lawful. You can't use a lawful conduct later to endow to. Let me back up a second. You can't use the existence of that lawful refusal to deal policy to bring that earlier conduct into the limitations period without creating the very problems that imposing the refusal to deal would create. Because that that would essentially render render suspect and subject to challenge lawful conduct that is lawful because or the very good antitrust policy reason that we want. We don't want to discourage investment in productive facilities by imposing inappropriate duties to assist competitors. All right. No further questions. Thank you. Miss Underwood, why don't you take two minutes? Just like to make a few points first on the question. Did Facebook require an act to stay away from other platforms? I would say this is another example of why a motion to dismiss isn't the right place to adjudicate any of this. There appears to be a factual dispute about what Facebook's written policy meant or what its practices were or how they were applied or how they were described to developers. The complaint plainly alleges that Facebook prohibited apps that merely access Facebook's APIs from also dealing with other social networking platforms. And it's undisputed that this was aimed at the emergence of a new of Google Plus's new platform that ultimately failed. And the court acknowledged that such a condition could be unlawful. The district court did, but rejected the allegation as implausible that dispute about what exactly was going on shouldn't be resolved on a motion to dismiss the complaint. And also the complaint alleges conduct outside the written policy, like degrading performance rather than cutting off access as retaliation for engaging in potentially competitive conduct. But can you give me the paragraphs of the complaint where those allegations are contained? Paragraph 199, paragraph 203, paragraph 205, 223, 227. These are allegations about what Facebook was doing. These are the conditions that you're claiming. Yes, not written as policies. One of them is a policy and some of them are just behavior. I also want to say that on this question that it's all too old and can't be remedied anymore. This is both as to prejudice and as to the continuing the possibility of remedying unlawful conduct. The allegation is, and the judge found, that there was a substantial anti-competitive effect and forward-looking remedies could be part of an injunction that would restore competition. On latches and American stores, American stores did not resolve this. Justice Kennedy had to write separately because the majority opinion didn't say what he wanted it to say. The majority opinion left it open, said the states are persons. Excuse me. The majority opinion mentioned latches, didn't it? Yes, it said latches and other equitable remedies could be applied to persons. They didn't engage with the question whether the states as parents were a special kind of person to whom this wouldn't apply, which is essentially our position that the states sue under the person statute, but they are different in important ways from other persons. The U.S. discussion of this question in the Microsoft brief was in a very different context. It wasn't even talking about latches at all. It's undisputed that the states, when they sue, are different and invoke governmental interests that are different from and in addition to private persons' interests. My adversary says they're more like a class action, but they're not a class action. We say they're more like the United States. They're somewhere in between, but they're governmental, sovereign states enforcing the law for governmental interests and deserve the treatment of a governmental interest. What's the governmental interest? The governmental interest is the harm to the economy as a whole, the harm to the marketplace. You cannot bring a parent's action just by aggregating individual private actions. You have to show some harm to the community as a whole, to the government, to the state. And that's what George, that's from the beginning, from Georgia, from SNAP, any discussion of parents will say that, which is what makes it different from a class action or different from a group of individual actions. Except that from the point of view of the defendant, it's absolutely no different. The defendant may not care who sues him, but the rule about Latches is to protect from the lapse of time the governmental interest, which is entitled to a different kind of consideration from. You see, with private parties, Latches is a time honored element of equity jurisprudence. And it protects defendants from stale claims, even if there's, but it used to be the statutes of limitation couldn't apply in equity. And that's why Latches grew up. But with respect to the sovereign interest, the United States, for example, there's hypotheticals that it could sue 20 years later. But the answer to that is another equitable doctrine, which says that the injunctive relief is discretionary. And if the United States brought an action like that, that for sure, that doctrine would kick in and prevent any recovery on behalf of the United States. It might prevent it. It wouldn't necessarily prevent remedies here. We have a United States case, a parallel FTC case here. And there are questions about retrospective relief and future relief and Latches undisputedly doesn't apply. That's why our argument is that there's there's no prejudice on the facts of this particular case. Am I correct that the only thing left in the FTC case is the acquisitions? And the judge's opinion certainly suggests that he didn't dismiss the I mean, he had the FTC lost on the platform claims. Well, he said he said adverse things about the platform claims. He didn't. I don't believe he actually dismissed them because he said he and I don't know whether that would be appealable or not. But certainly FTC did not appeal that adverse judgment. Correct. I don't want to speak to the FTC. I believe they either appealed or they didn't. They didn't appeal. Right. OK. This under what I want to talk about the history, frankly, because I have a different spin on the history. What we have is evidence from the history that parents' patriae actions were important to Congress. And they thought about them as important separately from private actions so that they didn't need to legislate to authorize parents' patriae actions for injunctive relief. Because the Supreme Court found parents' patriae actions for injunctive relief to be implied from the person's authority. But as soon as courts doubted the existence of a parallel state action for damage actions, Congress acted to establish that authority. So Congress's view was that if private individual actions were not enough, that state parents' actions were something different and should be authorized. So I just think that history needs to be understood as Congress's recognition of the importance of state parents' actions and the difference between them. All right. Thank you. Mr. Hauer, you want two minutes? Thank you. A quick point on latches. We didn't take a position here. No inference should be drawn from our not taking a position here. The two briefs that counsel Fermetta referred to in Microsoft and in Deutsche Telekom were district court briefs. And as a general matter, district court briefs don't require. On the conditions. Counsel Fermetta did not distinguish this court's treatment in Microsoft. Just as in Microsoft, the conditions here disable a certain form of working with, linking with and integrating them, clearly prohibited by the condition. As counsel for New York said, there's a factual dispute over on a motion to dismiss about how broad those policies have operation. But inferences must be given in favor of the non-movement. The conditions in both here and Microsoft do not necessarily. Well, certainly in Microsoft and say anything about how the app developers could interoperate or develop software for the rivals. Just as a district court here said in attempting to distinguish the facts of the rain journal, the conditions in Microsoft subject to the additional framework. Section two analysis didn't prohibit the app developers from working with rival platforms for developing different software for those rival platforms. Those conditions in the first wave agreements simply didn't speak to it. They were targeted at the software running on Microsoft operating system for a very specific reason. They wanted to disable cross-platform functionality. All you have to do to disable cross-platform functionality is to do what the district court said is thirty nine or two forty nine. Regulate quote unquote acceptable features operating on your own platform. If you make the features of the software operating on your own platform, not cross-platform functional and you've disabled cross-platform functionality. That's what the conditions at one ninety nine and two hundred one of the paint do exactly just as the conditions in Microsoft. All right. Thank you. Thank you.
judges: Henderson, Wilkins, Randolph